[Civ. No. 5739. Third Appellate District.—September 23, 1937.]

I. NOLANDER, Appellant, v. K. KNUTSEN, Respondent.

Gilbert Moody for Appellant.

Hjelm & Hjelm for Respondent.

PLUMMER, J.—The complaint in this action is based upon three promissory notes of the principal sum of $203 each, bearing interest at the rate of 6 per cent per annum. The defense to the action was lack of consideration. The defendant had judgment and the plaintiff appeals.

The plaintiff is the assignee of the Anglo-American Mill Company, of Owensboro, Kentucky. It appears that on or about May 29, 1930, the defendant contracted with the Anglo-American Mill Company, plaintiff's assignor, for the purchase of certain machinery, and after paying certain sums of money therefor, executed eighteen promissory notes in the sum of $203 each, all of which were paid except the three notes upon which this action is based.

The record shows that an agent of the Mill Company by the name of Mohr obtained from the defendant an order for the purchase of a No. 3 super miracle ace hammer mill. The original order, of which we have just made mention, together with the equipment mentioned in the order, brought the contract price to the sum of $6,645.60. Upon the receipt of the order by the Mill Company it appears from the record that the company in looking over the order came to the conclusion that certain accessories should be included in the order, and wrote to the defendant as follows:

"July 2, 1930.

"Mr. K. Knutsen,

"Turlock, California.

"Dear sir:

"In going over the plans we are preparing for you, checking them against your order, we find that your order does not include a magnetic separator for the Miracle Ace Hammer Mill, neither does it specify a variable speed drive for the chain drag feeder. Our Plan 4–G, from which the specifications of your mill were made by our Mr. Mohr, does not in-

clude these two very important accessories. Realizing that you are building an up to date plant, we feel that we should bring these matters to your attention. We have shown both of these accessories in our plans and feel quite sure that when we explain the necessity of them, that you will authorize us to include them with your shipment. . . .

"Their addition to the order will make the total order read as follows:

| | |
|---|---|
| "Contract price for equipment specified on order. . | $6645.60 |
| Extra for 10 ton scale and dump. . . . . . . . . . . . . . . . . | 400.00 |
| Extra for magnetic separator. . . . . . . . . . . . . . . . . . . | 150.00 |
| Extra for Reeves variable speed drive. . . . . . . . . . . . | 125.00 |
| Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $7320.00 |

"This increases your order $675.00 and we can equal it up by placing the additional amount of your deferred payments, if you want us to do so. . . . We have written you quite at length on these subjects but we feel that it is better to plan and arrange these things now rather than have to make changes later. We are very anxious to get you started right and feel that that is what you want us to do.

"We will appreciate an expression from you on the changes that we have suggested. As we have said before we are proceeding with the building of your machinery according to the specifications that we have outlined, and if our suggestions do not meet with your approval we will thank you to take the matter up with us immediately. We are,

"Yours very truly,
"ANGLO-AMERICAN MILL COMPANY,
"Chief Engineer."

Upon the receipt of this letter and wires which are not included in the transcript, the defendant wrote the following letter to the Mill Company:

"Turlock, Calif.,
"Aug. 19, 1930.

"Anglo-American Milling Co.
"Owensboro, Ky.
"Gentlemen:

"We have received your wires, your letter by airmail and a carload of machinery, the drafts and the notes. It is all here. . . .

"When I signed the contract for the machinery, Mr. Mohr was telling us that this was the complete machinery, and after receiving a letter from you to the effect that this was not complete, I was greatly surprised but I realize that a machine without a magnate is a dangerous thing so we had Mr. Mohr wire you to include this magnate and at the same time cancel the order for the corn cutter. . . .

"I want to thank you for the extension of time for the balance of payments and trust that everything will move on nicely so that we can meet the notes when they come due.

"We expect to hear from you again.

"Yours very truly.

"K. KNUTSEN."

On June 10, 1930, the Mill Company wrote to the defendant in relation to the scales included in the order, advising the defendant that a 5-ton scale was not of sufficient capacity to accommodate heavy trucks, and that a 10-ton scale should be ordered if heavy trucks were to be accommodated, and that the cost of this 10-ton scale would be $400 in addition to the cost of a 5-ton scale. In relation to this, defendant testified as follows: "Anglo-American Milling Company has a representative by the name of Mohr, and he was the one that made this contract, and he put in all the machinery, including the scale. When the Anglo-American Milling Company received this contract and looked it over, they claimed that the scale was too small; that Mr. Mohr had included in the deal, and they asked me if they might ship me a larger scale and add $400.00 and I said it was all right."

The record shows that the scales were never used by the defendant, and the reasons therefor are set forth in the following excerpt from his testimony: "Q. If you received the shipment in the latter part of August, 1930, when did you have the machinery set up? A. I had two mechanics to start as soon as the car was unloaded and they worked there three months and a half to complete the mill. Q. And when did it first begin to operate? A. Last part of December. Q. In 1930? A. Yes. Q. And when did you discover that you were dissatisfied with the scale? A. In April, 1933. Q. Was the scale operated between December, 1930, and April 1933? A. No, the scale has not been set up. Q. Was the scale not set up until April, 1933? A. The scale was not set up at my

place.  Q. What did you do with it?  A. I traded it.  I couldn't use it.  Q. To whom did you dispose of it?  A. To Fairbanks Morse Co. of San Francisco.  Q. Did you receive something for it?  A. Received $300.00.  Q. When was it that you disposed of it?  A. In July, 1933.  Q. Did you ever operate the scales?  A. No.  Q. When you set up your mill, why did you not set up your scales?  A. The scale was not necessary for the operation of the mill, as it was outside the building.  Q. Did it remain in its case until April, 1933?  A. Yes.  Q. You never had any communication or discussion with the Anglo-American Mill Co. about this scale until after April, 1933?  A. No.  Q. Did you ever operate the scale?  A. No. . . . Q. You didn't need these scales then?  A. The depression came in and so we didn't complete that part of it.  Q. Would it require other expenditures to install the scales, is that it?  A. Yes.  Q. And for that reason you didn't have them installed?  A. Yes.  Q. And then when you traded them off to Fairbanks Morse Co., you didn't get any scales from them either?  A. No.  Q. You just got a certain amount of money?  A. Yes.''

There is some argument in the briefs presented about a 15-ton scale, but there is nothing in the record showing that any such scale was mentioned in any orders or any of the letters written by the Milling Company, and that the corrected order was for a 10-ton scale, and not for a 15-ton scale.  The testimony shows that the defendant received a 10-ton scale, and that it was not on account of any defect in these scales that the same were not used, but on account of financial difficulty.

■ The alleged failure of consideration set up in the answer is based upon the idea that plan 4–G miracle mill included a magnetic separator and a Reeves variable speed drive, the magnetic separator being listed at a cost price of $150 and the Reeves variable speed drive at $125.  However, this contention is completely answered by the defendant's exhibit 2, which sets forth, under the heading of schedule A, all the items included in plan 4–G, as follows:

''*Quantity*                                                    *Price*

This plan 4–G consists of the following items:

1. No. 3 Super Miracle Ace Hammer Mill 50 H.P. direct connected motor and drag chain feeder, also collector and piping;

1. 2000 lb. Anglo-Geyser Batch Mixer with hopper scales and ground feed-bin over Molasses Agitator, 7½ H.P. motor;
1. No. 2 Miracle Molasses Process with direct connected motors and percentage feeder for governing the flow of mixed feed into Molasses Mixer;
1. Self-contained Rotary Corn-cutter, cleaner and grader, 7½ H.P. Motor;
1. Wagon and truck dump;
1. No. 24 Fox Hay Cutter.

Voltage 220;
Cycles 60;
Phase 3.''

Thus, in plain words, all of the items of machinery and their uses are made plain and distinct, and constituted the order executed by the defendant.

In connection with the scales we quote the testimony of the defendant further: ''Q. Well, will you tell us what did occur with regard to that scale? A. When the contract was signed and it got back to Kentucky, they claimed that that scale that Mohr had put in was too small, and they advised me that I should put in a bigger scale. Of course a 5-ton scale is an awfully small scale. I don't know who manufactures a 5-ton scale at this time, but I took it for granted that Mr. Mohr didn't know what scale or what price, and when the office found out he only put in $350.00 for allowance of the scale, they find (found) that was too cheap, and in order to make the deal go through they advised me that I should put in a larger scale, and charged me $400.00 for it. Q. They advised you to take a ten-ton scale, isn't that true? A. Yes.''

It appears from the foregoing that the defendant was fully advised as to the three items which were mentioned by the company in their letter, before proceeding to execute the order, and that the company received from the defendant his consent that the three items should be added to the order already sent in, and at the price mentioned by the company.

The record further shows that the defendant received all three of the items mentioned, and that outside of the scales, the other two items were used by him for three years without making any complaint whatever. His testimony, on the contrary, is that the mill and all the machinery equipment worked satisfactorily. That the magnetic separator and the

Reeves variable speed drive did constitute valuable accessories and added to the value of the equipment is beyond question. It appears from the record that the magnetic separator would not be an absolute necessity as an accessory, but is a valuable safeguard to prevent any pieces of metal going into the mill and thus injuring some portion of the machinery.

The record shows that all the machinery which we have mentioned, and the letters to which we have referred herein, and the information as to the increased price was before the defendant at the time the eighteen notes were executed. It may be here noted that none of the three notes sued upon were specially executed for the price of the three articles of machinery which we have mentioned. The full consideration appears to have been received without any question as to the price thereof or as to any misunderstanding in relation to the added accessories at an added price until just preceding the institution of this action.

There is nothing in the record indicating that plan 4–G of miracle mill included anything different from that which is scheduled in the order signed by the defendant. There is no testimony by anyone that plan 4–G contained anything additional to that specified in the order, nor is there anything in the record indicating that the order was signed, and that the defendant agreed to the inclusion of the added accessories on account of any misrepresentation, fraud or inducement of any kind.

Having advised the Mill Company to include the three items mentioned; having received the same and made use thereof, it is not conceivable how there could be any failure of consideration. That the defendant might have thought that plan 4–G included the extra items, is wholly immaterial, as shown by the fact that he signed an order containing a schedule which particularly mentioned everything contained in plan 4–G, and afterwards consented to the addition of the machinery mentioned, and also to the additional price thereof. We think this clearly shows that a finding of the court that there is a failure of consideration is not only without support in the testimony, but is directly contrary thereto.

The language found in 19 California Jurisprudence, page 1004, appears to us to be applicable here, to-wit: ''It is clear that there may be no contention that the consideration for

an instrument has failed where the maker has received the full consideration, which was agreed upon, and a defendant may not defeat the action on the ground of lack or failure of consideration, and retain any part thereof.'' To the same effect is *Continental Nat. Bank* v. *Doyle*, 55 Cal. App. 405 [203 Pac. 780].

█ The appellant asks that the judgment be reversed and also that the trial court be required to enter judgment for the plaintiff as prayed for. However, as the cause must go back for the calculation of interest and the determination of attorneys' fees, the trial court should experience no difficulty in ascertaining and entering the correct judgment. Therefore, the judgment entered herein should simply be reversed and the cause sent back for further hearing.

And it is so ordered.

Pullen, P. J., and Thompson, J., concurred.